## EXHIBIT A

## AFFIDAVIT OF TIM A. STOMMEL

I, Tim A. Stommel, being duly sworn, do hereby depose and state that:

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing criminal law and duly authorized by the Attorney General to request a search warrant. I am employed as a Special Agent with the United States Drug Enforcement Administration ("DEA") and have been for approximately 17 years. As such, I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I was hired by the DEA in March of 1997, and attended the DEA Academy for approximately 16 weeks. At the DEA Academy, I was trained in all aspects of conducting narcotics investigations, including training on criminal statutes, constitutional law, investigative tools and techniques, interviewing, and debriefing of witnesses. In addition to this initial training, I have attended continuing professional education training from the DEA and other agencies.

3. In August 1997, I was sworn as a DEA Special Agent and since then have been involved in numerous narcotics investigations. I am currently assigned to the Boston Office of the DEA's New England Division and have been since December 2013. Prior to this assignment I have worked in DEA Offices in Washington, D.C., Miami, Florida, Cartagena, Colombia and Bogota, Colombia. As a DEA Special Agent, I have participated in the investigation and prosecution of criminal organizations involved in the distribution of controlled substances and

related money laundering violations, both international and domestic. I have requested and participated in the preparation and execution of several search warrants resulting in the location and seizure of evidence of narcotics-trafficking, and assets derived from narcotics-trafficking and other illegal activities.

4. During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics-trafficking activities. In addition to my training, I have gained extensive experience in the investigation of the activities of narcotics traffickers. Over the course of my assignment with the DEA and my career as a police officer, I have debriefed more than 100 defendants, informants, and witnesses with personal knowledge about narcotics-trafficking activities and the operation of narcotics-trafficking organizations. I personally have participated in many aspects of narcotics investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, executing search warrants, and conducting court-authorized interceptions of wire and electronic communications.

5. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.

6. Based on my training and experience, I am aware that narcotics-trafficking typically involves the local, interstate, and international movement of illegal drugs to distributors, and co-conspirators at multiple levels, and the movement of the proceeds of narcotics-trafficking among multiple participants including suppliers, customers, distributors, and money launderers. Based on my training and experience, I am aware that in Massachusetts, narcotics and narcotics proceeds are often transported in motor vehicles.

7. I submit this Affidavit in support of a Verified Complaint for Forfeiture *in Rem* against the following asset:

    a. $266,000.00 in United States currency seized on June 1, 2014, from Leomir Celado at Sturbridge, Massachusetts (the "Defendant Currency").

8. This Affidavit does not set forth all of the facts developed during the course of this investigation. Rather, it sets forth and incorporates only those facts that I believe are necessary and sufficient to establish probable cause for forfeiture of the Defendant Currency.

9. This Affidavit is based upon my personal knowledge, as well as information provided to me by law enforcement personnel from various state and local agencies, including but not limited to the DEA's Enforcement Group 1 ("Enforcement Group 1") and Massachusetts State Police ("MSP"), involved in the investigation, and my review of records and reports relating to the investigation.

10. As set forth below, I have probable cause to believe that the Defendant Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

3

11. Further, I have probable cause to believe that the Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it is property, real or personal, which constitutes or is derived from proceeds traceable to a transaction or attempted transaction in violation of 18 U.S.C. § 1956.

## I. OVERVIEW OF THE INVESTIGATION

12. Beginning in March 2014, DEA Enforcement Group 1, Massachusetts State Police, and various other local law enforcement commenced an investigation into the distribution of heroin and cocaine in and around Lynn, Massachusetts, including Boston, Malden, and Saugus, by Leomir Celado ("Celado"). In connection with this investigation, on June 1, 2014, $266,000 in United States currency was seized from Celado, who was identified in surveillance as being involved in the transportation of drug proceeds.

13. On April 1, 2014, at approximately 3:00 p.m., law enforcement observed through surveillance a gray Ford 500, bearing Massachusetts license plate number 942-VN3 (the "Ford") driving in the area where a suspected narcotics purchase was going to take place in Danvers, Massachusetts. The Ford was registered to Enterprise Rental Car Company ("Enterprise"). The Ford was occupied by two unidentified males, and law enforcement saw the individuals inside the car conducting counter surveillance, driving cautiously through various parking lots, and looking into parked vehicles. The vehicle suddenly changed course, and shortly thereafter, law enforcement, through surveillance, observed the two men meeting with another male, who was seen getting into the Ford and seen leaving the Ford shortly thereafter. The Ford then left the area.

14. Following the surveillance on April 1, 2014, a review of the records received from Enterprise revealed that the Ford had been rented by Celado on March 21, 2014 until April

4

18, 2014 from the Enterprise located at 79 Freeport Street in Dorchester, Massachusetts. Celado also provided a phone number - (857) 498-4953 - to Enterprise when he completed the rental application. I obtained a driver's license photograph of Celado from the Massachusetts Registry of Motor Vehicles, and I positively identified Celado as one of the occupants in the Ford I saw during surveillance.

15.    On May 13, 2014, DEA officers, as well as other officers and agents from other state and federal agencies, commenced surveillance on Celado in Malden, Massachusetts, after learning from a confidential source that Celado was planning to rent a vehicle from Avis Rental Car ("Avis") located at Boston Logan Airport to transport heroin to New York, New York. Law enforcement observed Celado the same day at Avis at Boston Logan Airport renting a 2014 white Dodge Durango, bearing Massachusetts registration 716-RB1. A review of the records received from Avis revealed that Celado listed the same telephone number - (857) 498-4953 - on the Avis rental agreement. Based on prior surveillance and the information obtained from Avis and Enterprise, in addition to my training and experience, I had probable cause to believe that Celado was involved in narcotics trafficking and that he would be using his cellular telephone while transporting the shipment. On May 27, 2014, the Honorable Marianne B. Bowler, United States Magistrate Judge, District of Massachusetts (Case Number: 14-MJ-2164-MBB), authorized utilization of the GPS location service on Celado's cellular telephone, which law enforcement began monitoring the same day.

16.    On May 31, 2014, at approximately 4:00 p.m., law enforcement agents discovered through surveillance that Celado was at Avis Rental Car located near Massachusetts Logan Airport and that he rented a 2014 Dodge Durango, bearing Massachusetts license plate number 2AX-683 (the "Durango"). During approximately eight hours of surveillance, law enforcement

saw what appeared to be suspicious activity. They saw Celado use three different cars to drive to various locations where he stayed for short periods of time at each location. Based on my training and experience, this type of behavior is consistent with tactics used in the distribution of narcotics. Additionally, based on my training and experience, individuals involved in the distribution of narcotics often utilize different vehicles to avoid law enforcement detection.

17. Between approximately 9:00 p.m. and 10:00 p.m., law enforcement continued their surveillance and saw Celado driving two different cars, one of which was the Durango, for short periods of time and spend a brief period of time at the Highlands Apartment Complex located at 211 Kennedy Dr., Malden, Massachusetts. While Celado was driving the Durango, Celado went to a building located at 33 Lodgen Street, Malden, Massachusetts, which had an underground parking garage. Thereafter, law enforcement saw Celado coming out of the parking garage carrying shopping bags with handles and then observed him going into the front door of 33 Lodgen Street. Almost immediately thereafter, law enforcement saw Celado leave the vicinity in the Durango without the shopping bags. Based on my experience and training, I am aware that narcotics traffickers often use shopping bags and/or trash bags to conceal narcotics and narcotics proceeds as it is being transported to different locations to avoid detection by law enforcement. At approximately 10:27 p.m., electronic surveillance showed that the Durango arrived at 66 Hammond Street, Boston, Massachusetts, Celado's residence, that Celado stayed at this location until he left at approximately 11:27 p.m., and that the vehicle remained at that location until approximately 11:27 p.m.

## II. SEIZURE OF THE CURRENCY

18. Law enforcement agents continued surveillance of the Durango and discovered that it was traveling west on the Massachusetts Turnpike toward Interstate 84 at 12:12 a.m.

19.     At the request of DEA Special Agent Patrick B. Dorsey ("SA Dorsey"), at approximately 12:20 a.m., MSP Trooper Sean Maher ("Trooper Maher") stopped the Durango for a marked lanes infraction when he observed the Durango travel outside of a marked lane on Interstate 84 West in the Sturbridge, Massachusetts area. Celado was the sole occupant in the vehicle. Law enforcement agents believed, through information obtained during surveillance, that the Durango Celado was driving contained a large amount of narcotics trafficking proceeds.

20.     Trooper Maher requested the license of the driver, who was identified as Celado after he produced his driver's license. Shortly thereafter, MSP Trooper Jeffrey Johnson ("Trooper Johnson") arrived to assist Trooper Maher with the traffic stop. When Trooper Maher asked Celado where he was going, Celado gave vague responses, and Trooper Maher began to notice that Celado appeared nervous. Based upon Trooper Maher's knowledge of the ongoing DEA investigation, Celado's traffic infraction, nervousness, and vague stories about his destination, Trooper Maher conducted an exterior scan of the Durango with his MSP trained K-9 Fionn ("Fionn").

21.     Trooper Maher works with a K-9, Fionn, which is certified in the detection of narcotic odors. Fionn is certified in narcotic odor detection by the New England State Police Administrator's Conference. Fionn was certified on October 25, 2007, and is recertified annually.

22.     Fionn walked around the vehicle and alerted to the presence of narcotic odor near the rear of the vehicle. After the positive alert, Trooper Maher asked Celado's permission to tow the vehicle to another location so that a search could be conducted. Celado consented. Immediately thereafter, Trooper Maher requested that the Durango be towed to the Sturbridge State Police Barracks ("Sturbridge Barracks") for a more in-depth search of the vehicle. Celado

was told that law enforcement agents wanted to ask him additional questions at the Sturbridge Barracks, which he verbally consented to, and he was then transported to the Sturbridge Barracks in Sturbridge, Massachusetts.

23. The Durango was towed to the Sturbridge Barracks, and when Celado arrived at the Barracks, law enforcement officers told Celado that they wanted to conduct a more in-depth inspection of the vehicle. Celado verbally consented to a search of the vehicle. During the search, Trooper Maher and his K-9 conducted another exterior scan of the Durango, and the K-9 alerted again to the rear of the vehicle. During the consented to search of the Durango, law enforcement agents, including DEA agents, observed fresh hand prints on and around the spare tire compartment of the Durango. Law enforcement removed the Durango's spare tire, and found 27 bundles of wrapped United States currency, totaling $266,000.00. The bundles were wrapped in black duct tape. During the search of the vehicle, law enforcement officers did not find the shopping bags they previously saw Celado carrying. Based on my training and experience, proceeds from the illegal sale of narcotics are often hidden in various compartments of vehicles. Celado was given a traffic violation citation at the Sturbridge Barracks, and law enforcement personnel told Celado that he could leave, but that the Durango would be retained.

## CONCLUSION

1. Based on the information set forth above, I have probable cause to believe that the Defendant Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or

moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

2.     Further, based on the information set forth abvove, I have probable cause to believe that the Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it is property, real or personal, which constitutes or is derived from proceeds traceable to a transaction or attempted transaction in violation of 18 U.S.C. § 1956.

Signed under the pain and penalties of perjury, this __ day of June, 2015.

TIM A. STOMMEL
United States Drug Enforcement Administration